UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

ADASA INC.                          §
                                    §
v.                                  §       CIVIL NO. 4:24-CV-370-SDJ
                                    §
SML GROUP LIMITED, ET AL.           §

**<u>MEMORANDUM OPINION AND ORDER</u>**

The Court must determine the proper construction of the disputed claim terms in U.S. Patent No. 9,798,967 (the "'967 Patent"). Having considered the parties' filings, (Dkt. #55, #58, #60), their arguments at the claim construction hearing, the intrinsic and extrinsic evidence, and the relevant law, the Court issues this Claim Construction Order. *See Teva Pharms. USA v. Sandoz, Inc.*, 574 U.S. 318, 331–32, 135 S.Ct. 831, 190 L.Ed.2d 719 (2015); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).

## I. BACKGROUND

Plaintiff ADASA Inc. ("ADASA") alleges that Defendants SML Group Limited, SML Intelligent Inventory Solutions LLC, and SML (USA) Inc. (collectively, "SML") have infringed ADASA's '967 Patent.

The '967 Patent, titled "Systems, Methods, and Devices for Commissioning Wireless Sensors," was filed on February 12, 2016, and issued on October 24, 2017. It claims priority to a provisional application filed on May 22, 2007. The '967 Patent relates to methods and systems for "point-of-use" and "on-demand" commissioning of radio frequency identification (RFID) transponders. '967 Patent at 3:27–32. RFID transponders, or RFID tags, identify and track objects by electronically encoding data

in a compact tag. *Id.* at 1:32–34. The advantage over similar technologies, such as barcodes, is RFID tags do not need external, optically recognizable, or human-readable markings, and can communicate the encoded data over greater distances using radio-frequency transmission. *Id.* at 1:34–39, 6:28–59.

RFID tags are encoded with information, such as an object identifier, through a process known as "commissioning." *Id.* at 1:40–53. For accurate tracking, the encoded data must be unique to each individual RFID tag. *Id.* at 2:21–25, 2:48–50. Uniqueness is ensured by assigning each RFID tag an Electronic Product Code (EPC or EPCglobal) in accordance with certain global formatting standards. *Id.* at 2:21–22. An EPC is a serialized object number comprising object class information and a serial number that uniquely identifies the associated object. *Id.* at 9:7–15.

Ensuring uniqueness is not simple. *Id.* at 2:49–50. Serialization generally "requires a central issuing authority of numbers for manufacturers, products, and items to guarantee uniqueness and to avoid duplication of numbers." *Id.* at 2:23–25. The issuing authority assigns blocks of numbers to remote locations, such as a manufacturer. *Id.* at 2:25–29. The encoded numbers must generally be reconciled by comparison to a central database "either one or several numbers at a time." *Id.* at 2:30–32. Each remote location then "further allocate[s] numbers from its upper level database to as many lower database levels as it deems necessary to distribute number authority throughout its enterprise." *Id.* at 7:61–8:3.

There are downsides to using central databases to distribute the allocated blocks of numbers. For example, this process requires encoders to maintain a

continuous network connection with the database so that new serial numbers can be retrieved whenever an RFID tag is commissioned. *Id.* at 3:27–4:4. Issues may arise when a continuous connection is not possible, or the commissioning process is interrupted by network delays. *Id.* at 3:64–4:4.

To overcome these issues, the '967 Patent uses systems and methods for commissioning RFID tags "on-demand" and "with no external authorizations or queries required on a transponder-by-transponder basis." *Id.* at 3:27–35. This allows the commissioning process to be done without continuous connectivity to a central database. *Id.* at 3:64–67. In one embodiment, pre-authorized ranges of serial numbers for specific object classes are allocated to lower levels in the hierarchy, such as individual encoders. *Id.* at 8:4–11. The object class serial number space is subdivided into sectors defined by a series of fixed "Most Significant Bits" (MSBs), wherein the number of allocatable sectors is determined by the number of MSBs. *Id.* at 8:11–15. Notably, once the block has been allocated to the encoder, there is no need to reconnect to the central database until all the unique numbers have been assigned. *Id.* at 8:37–51.

For example, according to the SGTIN-96 standard, the serial number space consists of 38 bits which can encode $2^{38}$ distinct serial numbers. *Id.* at 8:21–29. If the first 14 of these bits are designated as MSBs, then the serial number space is correspondingly subdivided into $2^{14}$ sectors or "blocks" which can be allocated to as many as $2^{14}$ different encoders. *Id.* The remaining 24 bits can then be used to encode a unique serial number space within a given block. *Id.* "Each allocated block of serial

numbers represents authority for encoding objects of an object class that can either be used by an encoder for encoding transponders, or allocated to a lower level in the authority hierarchy." *Id.* at 8:32–36.

The Abstract of the '967 Patent states:

> In one embodiment the present invention comprises a smartphone and encoders for commissioning RFID transponders. The present invention further includes novel systems, devices, and methods for commissioning RFID transponders with unique object class instance numbers without requiring a realtime connection to a serialization database.

Claim 1 of the '967 Patent, issued following a 2018 reexamination, is an illustrative claim and recites the following elements (disputed terms in italics):

> 1. An RFID transponder comprising:
> a substrate;
> an antenna structure formed on the substrate; and
> an RFID integrated circuit chip which is electrically coupled to the antenna structure,
> wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space,
> wherein the unique serial number space is encoded with one serial number instance from *an allocated block of serial numbers*, the allocated block being assigned a limited number of most significant bits,
> wherein the unique serial number space comprises the limited number of most significant bits *uniquely corresponding* to the limited number of most significant bits of the allocated block and of remaining bits of lesser significance that together comprise the one serial number instance.

'967 Patent Ex Parte Reexamination Certificate at 1:21–39.

4

## II. APPLICABLE LAW

Claim terms are generally given their plain and ordinary meaning. *Phillips*, 415 F.3d at 1312. The plain and ordinary meaning of a term is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution. *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The Federal Circuit has counseled that "[t]he standards for finding lexicography and disavowal are exacting." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). To act as their own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term" and "clearly express an intent to redefine the term." *Thorner,* 669 F.3d at 1365 (international quotation marks and citation omitted).

Outside of these exceptions, the Federal Circuit has also found that plain-and-ordinary meaning is inappropriate when a term has more than one ordinary meaning or when reliance on a term's ordinary meaning does not resolve the parties' dispute. *O2 Micro Int'l v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). In that case, the court must explain what the plain-and-ordinary meaning is. *Id.*

To discern the plain meaning of a given claim term, courts start with the "actual words" of the claims. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). When looking to those words, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or

unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning, for there is a general presumption that different claim terms have different meanings. *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1366 (Fed. Cir. 2000) ("Under the doctrine of claim differentiation, two claims of a patent are presumptively of different scope."). For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include that limitation. *Phillips*, 415 F.3d at 1314–15. But this presumption may be rebutted with intrinsic evidence. *Seachange Int'l v. C-COR, Inc.*, 413 F.3d 1361, 1376 (Fed. Cir. 2005).

After the claim language, courts next look to the specification. After all, claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). The specification "'is always highly relevant to the claim construction analysis'" and is usually "'dispositive.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Indeed, the specification "'is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp.*, 90 F.3d at 1582). That said, "particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988). In fact, it is improper to do so "absent a clear indication in the intrinsic record that the patentee intended the claims

to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

"Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. In "distinguishing the claimed invention over the prior art, an applicant is indicating what" a claim does not cover. *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379 (Fed. Cir. 1998). The doctrine of prosecution disclaimer thus precludes a patentee from recapturing a specific meaning that was previously disclaimed during prosecution. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). "[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." *Id.* at 1325–26. Accordingly, when "an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

Outside of the intrinsic evidence—the claims, the specification, and the prosecution history—courts may also look to extrinsic evidence, like technical dictionaries or expert testimony. Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (internal quotation marks and citation omitted). For instance, technical dictionaries may be helpful, but they may also provide definitions that are too broad or not indicative of how the term is used in the

patent. *Id.* at 1318–22. Expert testimony may also be helpful, but an expert's conclusory or unsupported assertions as to the meaning of a term are not. *Id.* at 1318. In general, therefore, extrinsic evidence is "less reliable" when "determining how to read claim terms." *Id.*

### III.    LEVEL OF ORDINARY SKILL IN THE ART

Patents are interpreted from the perspective of a person of ordinary skill in the art ("POSITA"). To determine the appropriate level of skill, courts consider six factors: "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Env't Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983). The Federal Circuit has noted, however, that "[t]hese factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

SML contends that a POSITA at the time of the alleged invention of the '967 Patent would have had "a bachelor's degree in electrical engineering or computer engineering and at least two years of experience in the field of integrated circuit design or an equivalent combination of education, work, and/or experience." (Dkt. #58 at 12) (citing Dkt. #58-6 ¶ 43). During the hearing, ADASA agreed with SML's proposal for a POSITA. Accordingly, the Court finds that a POSITA must have at least a bachelor's degree in electrical engineering or computer engineering and at

8

least two years of experience in the field of integrated circuit design or an equivalent combination of education, work, and/or experience.

## IV. CONSTRUCTION OF AGREED TERMS

The parties have agreed to the construction of the following terms:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "object class information space" | "data field within the memory of the RFID integrated circuit chip for information identifying the class of an object, such as a company prefix, item reference code, partition value, and/or filter value." |
| "unique serial number space" | "data field within the memory of the RFID integrated circuit for information identifying a unique serial number." |
| "being assigned a limited number of most significant bits" | "includes a limited, predefined sequence of higher order bits at the leading end." |
| "remaining bits of lesser significance" | "the remaining lower order bits at the trailing end." |
| "encoded with one serial number instance" | "has stored within it one serial number instance." |

(Dkt. #48-1 at 2). Given the parties' agreement, the Court **ADOPTS** these constructions.

## V. CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of two terms or phrases used in the '967 Patent. The Court takes each in turn.

### A. "an allocated block of serial numbers"

| Disputed Term | ADASA's Proposal | SML's Proposal |
|---|---|---|
| "an allocated block of serial numbers" | "a pre-authorized range of serial numbers" | "a pre-authorized range of binary serial numbers" |

#### 1. Analysis

The phrase "an allocated block of serial numbers" appears in asserted claims 1 and 13 of the '967 Patent. The Court finds that the phrase is used consistently in

9

the claims and is intended to have the same general meaning in each claim. The parties dispute whether the allocated block of serial numbers must be in binary, as opposed to decimal or other numbering systems.

The Court notes that this term was previously disputed in patent infringement litigation involving ADASA and another RFID tag manufacturer. *See ADASA v. Avery Dennison*, Case No.6:17-cv-01685-TC, District of Oregon (Jan 22, 2019) (the "*Avery*" litigation). The issue presented by the parties in *Avery* was not identical to the one here. The defendant in *Avery* contended that "an allocated block of serial numbers" as recited in claim 1 "has been assigned to an encoder." (Dkt. #55-4 at 10). The court rejected this contention, reasoning that "the novel feature advanced throughout the reexamination by [ADASA] [was] that the claimed RFID transponders utilize a partitioned serial number space comprising most significant bits that was not present in any prior art references." (Dkt. #55-4 at 9). Thus, the court adopted ADASA's construction that the phrase should be construed as "a pre-authorized range of serial numbers." (Dkt. #55-4 at 10). This Court agrees with the *Avery* court's conclusion.

First, SML contends that during reexamination and IPR proceedings ADASA disclaimed allocating serial numbers in any form other than binary. Contrary to SML's contention, ADASA did not clearly and unmistakably limit allocating serial numbers to binary form. Rather, ADASA argued that the novel feature of the '967 Patent is the allocated block being assigned a limited number of MSBs within the serial number space. The '967 Patent does not require that an allocated block of serial numbers be kept in binary form by the encoding authority. SML's interpretations of

10

ADASA's statements during reexamination and IPR proceedings improperly applies ADASA's limitation to the representation during allocation and is rejected.

SML cites a number of statements made by ADASA during reexamination proceedings. ADASA's references to "binary level" in the reexamination were in the context of the MSBs. For example, during the reexamination ADASA argued:

- "[T]he entire point of claim 1 is to require a serial number instance that was selected from an allocated block that was specifically assigned (or allocated) *based on a limited number of most significant bits*." (Dkt. #58-3 at 26) (emphasis added).

- "[A]s recited in claim 1, *the limited number of MSBs* are specifically assigned . . . it is the way the serial number that is created and managed by *assigning MSBs at the binary level* that distinguishes the claimed invention of the '967 Patent over the [prior art]." (Dkt. #58-3 at 98–99) (emphasis added).

- "[A]ssigning a range of decimal numbers in no way discloses or suggests assigning an allocated block *based on a limited number of most significant bits*." (Dkt. #58-3 at 26) (emphasis added).

- "[T]he encoded *limited number of most significant bits* in binary is neither disclosed nor suggested by the prior art's teaching that serial numbers may be assigned based on a series of decimal numbers." (Dkt. #58-3 at 19) (emphasis added).

These statements indicate that ADASA distinguished the claims of the '967 Patent from the prior art on the basis that the prior art failed to teach the use of the MSB data structure within the serial number space. However, ADASA did not, as SML contends, limit the allocated block of serial numbers to a pre-authorized range of *binary* serial numbers. Therefore, ADASA's statements during the reexamination and IPR proceedings were not clear and unmistakable disclaimers as SML contends.

Additionally, in the *Avery* reexamination, the examiner found that the prior

art disclosed the encoding limitations. The examiner stated the prior art allocated a first block of serial numbers in decimal in the range of "one to a million" and a second block "in a range of about three to four million." (Dkt. #58-3 at 46). This resulted in the first block of one to one million having "00000" as the most significant bits in binary with a range of "0000000000000000000000001 to about 0000011111111111111111111." *Id.* The second block of three to four million would have "00011" as the most significant bits with a range of "0001100000000000000000000 to 0001111111111111111111111." (Dkt. #58-3 at 46). Specifically, the examiner explained:

> It would be well understood in the art that a block of one million serial numbers would require at least 20 bits in binary, and that in a serial number space having a total of 25 bits (such as taught by 200 Patent), a first block of numbers from "one to a million" would be expressed as 25-bit binary numbers 0000000000000000000000001 to about 0000011111111111111111111. A different block of numbers in a range of about "three to four million" can be expressed as binary numbers 0001100000000000000000000 to 0001111111111111111111111, for example.

*Id.* at 50–51.

Following this rejection, ADASA requested an examiner interview and provided a proposed agenda. (Dkt. #58-3 at 11–12). In the proposed interview agenda, ADASA stated the following:

> The Patentee would like to demonstrate that the examples do not teach the general principle of using the most significant bits in a tag.
>
> Example used: another block assigned to a second manufacturing division can be 3,456,789 (i.e., "a number in the range three to four million"), represented as

12

00011010010111111100010101.

Now instead, choose a second number from the same range three to four million 3,056,789 represented as 000101110101001001001010101 having a different value for the five MSBs. This would produce an invalid outcome for a brand owner using the most significant bits to allocate blocks, so therefore it would not have been obvious to use MSBs to allocate blocks of serial numbers.

Furthermore, a third number 4,056,789, a number in the range four to five million represented as 00011110111100110110101 has 00011 as its most significant bits. This 5-bit number exactly matches the five MSB's from the Examiner's first example above (i.e. 3,456,789). Therefore using the MSBs to allocate blocks would result in duplication of serial numbers, which violates the requirements for uniquely numbered EPC RFID tags as set [forth] in the EPCglobal Tag Data Standard. It would therefore have been obvious to one having ordinary skill in the art to NOT mix binary block allocation with decimal block allocation. This is what our expert, in speaking to others skilled in the art, correctly describes as mixing apples with oranges (Williams Declaration, paragraph 57).

(Dkt. #58-3 at 11–12). Following the interview, ADASA amended the then-rejected

claims to recite the additional underlined terms:

wherein the unique serial number space comprises the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block and of remaining bits of lesser significance that together comprise the one serial number instance.

(Dkt. #58-3 at 14). Afterwards, the examiner issued a Notice of Allowability stating

that the combined prior art of record "does not specifically disclose or fairly teach an

RFID transponder" with the recited limitations including:

a unique serial number space encoded with one serial number instance from an allocated serial block of

numbers,
>    the allocated block being assigned *a limited number of most significant bits*,
>    wherein the unique serial number space comprises *the limited number of most significant bits uniquely corresponding to the limited number of the most significant bits of the allocated block.*

(Dkt. #58-3 at 7) (emphases added). Thus, the examiner agreed that the prior art failed to teach the use of the MSB data structure within the serial number space, as ADASA argued during the interview. In the interview summary, the examiner explained that ADASA asserted "the cited prior art's allocation is based on decimal numbers without regard to the resulting MSBs after decimal-to-binary conversion," and "that the allocated decimal ranges taught by the cited prior art result in arbitrary binary number ranges and therefore do not suggest the clean binary number ranges with MSBs uniquely corresponding to blocks of numbers." (Dkt. #58-3 at 9). Accordingly, the Court rejects this part of SML's argument.

SML also raises the issue that "the '967 Patent is currently challenged in two pending IPR Petitions, one filed by a third party, r-pac, [sic] and one filed by SML." (Dkt. #58 at 22). SML contends that ADASA "doubled down on its disclaimer from reexamination, emphasizing that the '967 patent claims allocated blocks of binary serial numbers and does not cover allocating blocks in decimal." (Dkt. #58 at 22–23). SML also argues that ADASA put forth these same arguments in its response to SML's IPR petition. (Dkt. #58 at 22–23).

As the court determined above, ADASA did not clearly and unmistakably disclaim allocating serial numbers in forms other than binary. Just as in the reexamination proceedings, the reference to "binary representation" is in the context

of the claimed MSBs:

- "*Use of MSBs* is a hardware-based approach that uses the available physical memory of the RFID tag to define large pre-authorized blocks for delegating encoding authority and permit quasi-autonomous encoding operation." (Dkt. #58-7 at 20) (emphasis added).

- "This practice does not result in binary encodings comprising *a static MSB sequence* followed by bits of lesser significance, as claimed." (Dkt. #58-7 at 11) (emphasis added).

- "The '967 Patent discloses a specific manner for implementing preferred large pre-authorized blocks implementing *the novel use of "most significant bits"* for defining allocated blocks." (Dkt. #58-8 at 17) (emphasis added).

- "*Use of MSBs* is a hardware-based approach that uses the available physical memory of the RFID tag to define large pre-authorized blocks for delegating encoding authority and permit quasi-autonomous encoding operation." (Dkt. #58-8 at 19) (emphasis added).

- "This demonstrates that more is needed to practice the claimed data structure limitations *implementing MSBs within the encoded serial number space* than just applying a methodology for generating serial numbers that involves combining multiple decimal values." (Dkt. #58-8 at 57) (emphasis added).

ADASA has notified the Court that the Patent Trial and Appeal Board ("PTAB") issued a decision denying institution of R-Pac International Corporation's IPR Petition (IPR2024-01416) relating to U.S. Patent No. 9,798,967. (Dkt. #59 at 1). In the decision, the Board referred to the reexamination file history discussed above, (Dkt. #59-1 at 24–29), and determined that "the Examiner fully considered the Applicant's arguments and agreed that the amendments overcame the rejection." (Dkt. #59-1 at 29). ADASA has also notified the Court that the PTAB issued a decision

denying institution of SML's IPR Petition (IPR2025-00125). (Dkt. #73).

SML next argues that the "claims make clear that the serial numbers in an allocated block are binary." (Dkt. #58 at 23). SML notes that the claims recite the term "bit," and argues that "[s]erial numbers based on decimal are not defined by a limited number of *bits*, but rather ten decimal numerals (i.e., numbers from 0 to 9)." (Dkt. #58 at 24) (citing Dkt. #58-6 ¶ 48). SML also contends that the specification describes starting with all the possible *binary* serial numbers in an "entire object class serial number space," which is "defined by the number of serial number bits that are used." (Dkt. #58 at 25) (quoting '967 Patent at 8:11–31).

The Court first notes that the specification describes an allocated block of serial numbers as follows:

> Once a sector is allocated to a lower level within an authority hierarchy, it is referred to as a block. Each allocated block of serial numbers represents authority for encoding objects of an object class that can either be used by an encoder for encoding transponders, or allocated to a lower level in the authority hierarchy.

'967 Patent at 8:31–36. There is nothing in this disclosure that would clearly and unambiguously limit an "allocated block" to encompass exclusively a pre-authorized range of serial numbers that may only be identified as a binary representation of serial number values.

ADASA argues that the "representation" of a numerical value is how that number is shown for the appropriate party or entity to understand it. (Dkt. #60 at 5). ADASA contends that while the RFID tag is ultimately encoded only in binary, the generation and allocation of unique serial number values for serialization is first

16

created by humans. (Dkt. #60 at 6). ADASA further maintains that serialization is almost always "represented" in a "decimal" format in product documentation for the ease of readability by users. (Dkt. #60 at 6).

For example, ADASA states that binary data strings starting at "0001|0000000000000000000000000000000" and ending at "0001|1111111111111111111111111111111," are represented using decimal numbers 17,179,869,184 and 34,359,738,367. (Dkt. #60 at 7 n.2). According to ADASA, SML conflates the differences between "representations" with requirements that "an allocated block of serial numbers" must only be represented in binary form. (Dkt. #60 at 6–7). ADASA argues that this allows for different infringement determinations based solely upon whether or not binary is used to identify allocated blocks prior to encoding. (Dkt. #60 at 7).

The Court agrees with ADASA that the specification, claims, file history, reexamination history, and ADASA's statements to the USPTO do not limit the representation of the "allocated block of serial numbers" to only a "binary" representation. As discussed, ADASA distinguished the claims from prior art based on limitations requiring use of the claimed MSB data structure. Accordingly, it would be improper to limit the "allocated block of serial numbers" to only a binary representation.

SML also argues that ADASA's previous litigation statements confirm that the serial numbers in the allocated block are in binary. (Dkt. #58 at 26). SML contends that ADASA represented to the District of Oregon that the allocated blocks of serial

numbers are in binary. (Dkt. #58 at 26–27) (citing Dkt. #58-9 at 15–18). SML further contends that ADASA's expert, Dr. Daniel Engels, testified that the inventive element of the '967 Patent "is targeted specifically at the binary representation in the RFID tag itself" and "not concerned with a decimal representation." (Dkt. #58 at 27). SML also argues that the inventor, Clarke McAllister, testified that "allocating blocks of numbers in serial batches and then encoding them, converting them into binary," was not his invention. (Dkt. #58 at 28).

The Court disagrees that this extrinsic evidence provides a clear and unmistakable disclaimer. As stated by the *Avery* court, the arguments made by ADASA to distinguish prior art "focuses solely on the novel feature advanced throughout the reexamination by ADASA—*that the claimed RFID transponders utilize a partitioned serial number space comprising most significant bits that was not present in any prior art references*." (Dkt. #55-4 at 9) (emphasis added). These arguments were intended to show that the prior art failed to teach "the allocated block being assigned a limited number of most significant bits." In sum, the excerpted arguments did not distinguish the claims based upon practice of "an allocated block of serial numbers," and are not a clear and unmistakable disclaimer of claim scope. Accordingly, blocks of serial numbers may be allocated in decimal numbers and later encoded in binary.

## 2. Court's Construction

For the reasons set forth above, the Court construes the phrase **"an allocated block of serial numbers"** to mean **"a pre-authorized range of serial numbers."**

## B. "uniquely corresponding"

| Disputed Term | ADASA's Proposal | SML's Proposal |
|---|---|---|
| "uniquely corresponding" | Plain and ordinary meaning, no construction necessary. | "Plain and ordinary meaning, which means that only the serial numbers in the allocated block contain the same most significant bits, and no other serial numbers" |

### 1. Analysis

The term "uniquely corresponding" appears in asserted claims 1 and 13 of the '967 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties agree that the term should be given its plain and ordinary meaning. However, SML further qualifies the plain and ordinary meaning.

The Court rejects SML's further qualifications and adopts the plain and ordinary meaning of the term "uniquely corresponding." The Court agrees that "uniquely corresponding" means there is a "one-to-one correspondence" between the MSBs defining a block of serial numbers and the range of serial numbers within that block such that serial numbers from each block are guaranteed to be unique. No additional qualifications are needed to make this clear. The intrinsic evidence indicates that the plain and ordinary meaning is conclusive.

The claims of the '967 Patent were amended during the reexamination to require the recited "unique serial number space" to include "the limited number of most significant bits *uniquely* corresponding to *the limited number of most significant bits of* the allocated block and of remaining bits of lesser significance that together

comprise the one serial number instance." (Dkt. #55-2 at 43) (amendments italicized). ADASA argued that "the proper interpretation of claim 1 requires that the serial number space must include a serial number instance that was selected from an allocated block that was specifically assigned (or allocated) based on a limited number of most significant bits and the serial number space is encoded with this data such that the limited number of most significant bits *uniquely* corresponds to the limited number of most significant bits of the allocated block." (Dkt. #58-3 at 25). Thus, the claims are limited to a serial number space that "could be partitioned into most significant bits and bits of lesser significance." (Dkt. #58-3 at 28). Once partitioned, a limited number of MSBs are assigned to an allocated block of serial numbers, and then unique serial numbers are created by combining the MSBs of the allocated block with bits of lesser significance.

The specification discloses a "preferred method of providing pre-authorized blocks of object class serial numbers" by "subdivid[ing] the entire object class serial number space into sectors that are defined by a limited number of [MSBs] of the serial number field." '967 Patent, 8:11–15. SML's expert contends that "[s]ubdividing all possible serial numbers (the entire serial number space) into blocks 'defined by a limited number of [MSBs]' would result in a block of serial numbers where only the serial numbers in the allocated block contain the same most significant bits, and no other serial numbers do." (Dkt. #58-6 ¶ 66). The Court generally agrees with SML's expert statement. Additionally, ADASA stated in *Avery* that "Defendant's construction that only the serial numbers in the allocated block contain the same

most significant bits, and no other serial numbers, is not necessarily incorrect." (Dkt. #58-14 at 24).

Moreover, the Federal Circuit cited the District Court's Markman Order and explained that "uniquely corresponding" means there is a "one-to-one correspondence" between the MSBs defining a block of serial numbers and the range of serial numbers within that block such that serial numbers from each block are guaranteed to be unique. (Dkt. #58-4 at 12–13). While SML's interpretations are generally correct, SML's qualifications do not add anything to the claim language. Accordingly, the Court finds the term "uniquely corresponding" should be given its plain and ordinary meaning.

Additionally, SML argues that its construction makes clear that this term requires more than just "correspondence" between the encoded MSBs and the allocated MSBs. (Dkt. #58 at 30). SML contends that the term "uniquely" means that there is a one-to-one correspondence between the allocated MSBs in the block and the encoded MSBs in the tag. (Dkt. #58 at 30–31). According to SML, its construction conforms to what ADASA agreed was the plain and ordinary meaning of "uniquely corresponding" in the *Avery* case. (Dkt. #58 at 31). SML argues that collateral estoppel and *stare decisis* bar ADASA from disputing SML's proposed construction. (Dkt. #58 at 31).

ADASA responds that SML incorrectly argues that its proposed construction "states verbatim what ADASA agreed was the plain and ordinary meaning in the *Avery Litigation*." (Dkt. #60 at 10) (citing Dkt. #58 at 30). The Court agrees with

21

ADASA. Contrary to SML's contention, the record indicates that ADASA opposed adoption of the construction proposed by Avery, because it was "unsupported by the intrinsic record and makes little sense in the context of the claim." (Dkt. #60 at 10) (citing Dkt. #58-14 at 25). ADASA further argued that: "[a]doption of Avery's construction yields a confusing string of circular language that ultimately places limits on elements that are otherwise not part of the claim—other serial numbers within the allocated block. Because . . . the asserted claims are not directed to a plurality of RFID transponders and a corresponding plurality of serial number instances, Avery's construction [is] inapposite and must be rejected." (Dkt. #58-14 at 25). Although ADASA agreed that saying "only the serial numbers in the allocated block contain the same most significant bits, and no other serial numbers, is not necessarily incorrect," ADASA clearly opposed Avery's construction. (Dkt. #58-14 at 24). Accordingly, SML's collateral estoppel argument is unpersuasive.

Regarding the *stare decisis* argument, SML contends that the Federal Circuit determined "uniquely corresponding" means "for any set of MSBs there is exactly one corresponding allocated block, and for each allocated block there is exactly one set of MSBs," and that this "one-to-one correspondence has important technological consequences." (Dkt. #58 at 35) (citing Dkt. #58-4 at 12–13). SML further argues that the Federal Circuit reasoned that, "[b]ecause the predefined sequence of MSBs in a given serial number uniquely corresponds to an allocated block, and vice versa, serial numbers drawn from different blocks are guaranteed to be unique." (Dkt. #58 at 35–36). In SML's view, these conclusions "compel[] SML's construction of 'plain

and ordinary meaning, which means that only the serial numbers in the allocated block contain the same most significant bits, and no other serial numbers.'" (Dkt. #58 at 36).

The Court agrees that the Federal Circuit explained that "uniquely corresponding" means there is a "one-to-one correspondence" between the MSBs defining a block of serial numbers and the range of serial numbers within that block such that serial numbers from each block are guaranteed to be unique. (Dkt. #58-4 at 12–13). However, SML's proposed qualifications do not add anything to the claim language. Accordingly, SML's proposal to further qualify the term will not be adopted.

Finally, SML argues that the claims and specification disclose that only serial numbers in the allocated block contain the same MSBs. (Dkt. #58 at 36). SML also contends that the prosecution history shows that the encoded bits must uniquely and directly correspond to the allocated bits. (Dkt. #58 at 36–37). The Court agrees that the intrinsic evidence indicates that "uniquely corresponding" means there is a "one-to-one correspondence" between the MSBs defining a block of serial numbers and the range of serial numbers within that block such that serial numbers from each block are guaranteed to be unique. (Dkt. #58-4 at 12–13). The specification indicates that "[e]ach allocated block of serial numbers represents authority for encoding objects of an object class" such that the most significant bits in each object class is unique. '967 Patent at 8:32–36. However, SML's proposal does not add anything to the claim language, other than unnecessary confusion and redundancy.

### 2. Court's Construction

For the reasons set forth above, the term **"uniquely corresponding"** is given its plain and ordinary meaning.

## VI.  CONCLUSION

The Court adopts the above constructions. The parties are **ORDERED** to not refer, directly or indirectly, to each other's claim-construction positions in the presence of the jury. Likewise, the parties are **ORDERED** to refrain from mentioning any part of this opinion, other than the definitions adopted by the Court, in the presence of the jury. The parties are also reminded that the testimony of any witness is bound by the Court's reasoning in this order but that any reference to claim-construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**So ORDERED and SIGNED this 13th day of November, 2025.**

_____

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE